## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Edwin Martinez (R27255), | ) | |
| | ) | |
| Mr. Martinez, | ) | |
| | ) | Case No. 22 C 568 |
| v. | ) | |
| | ) | Hon. Elaine E. Bucklo |
| | ) | |
| Anthony Wills, Warden, | ) | |
| Menard Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

At the close of a 2003 bench trial in the Circuit Court of Cook County, Edwin Martinez[1] was convicted of the December 2000 murder of seventeen-year-old Robert ("Bobby") Sanchez[2] and sentenced to fifty years in prison. Now in custody at the Menard Correctional Center, Mr. Martinez brings this counseled habeas corpus petition pursuant to 28 U.S.C. § 2254, claiming that his trial counsel, Joseph Lopez, provided him constitutionally ineffective assistance and that the state courts unreasonably held otherwise. Mr. Martinez's central theory is that that the state's case relied so heavily on the testimony of witness Adam Reyes—who, by his own admission, provided Mr. Martinez the putative murder weapon, yet was not charged with any offense in this case—that defense counsel's failure to discredit Reyes's testimony likely influenced the outcome of the case.

Mr. Martinez points to three pieces of evidence that his attorney failed to present, and that, in his view, would have put the lie to Reyes's testimony and rendered the state's theory of the case

---

[1] The record often refers to Mr. Martinez by his nickname, "Chico." Dkt. 1-5 at 43.
[2] Witnesses frequently referred to Sanchez as "Bobby," which I use here for clarity to differentiate him from witnesses who share his last name.

implausible. First is a witness named Rachel Narbaiz, who Mr. Martinez claims would have contradicted Reyes's testimony that Mr. Martinez twice solicited him to kill Bobby—once in Narbaiz's presence. The omission of Narbaiz's testimony was particularly prejudicial, Mr. Martinez argues, because his attorney suggested in his opening statement that the court would hear from Narbaiz. Next, defense counsel failed to lay the foundation necessary to admit into evidence the contents of a restaurant receipt whose time stamp, Mr. Martinez insists, would have cast serious doubt on the state's timeline of events. This omission, too, was especially egregious because counsel's opening statement heralded the receipt as "the most telling piece of evidence in this case that has been completely overlooked" and that "would prove who [Bobby] is with." Dkt. 1-5 at 31. Finally, defense counsel failed to call Mr. Martinez's mother and stepfather as alibi witnesses who would have testified to the time Mr. Martinez arrived at their home on the evening Bobby disappeared—testimony that would have further undermined the state's timeline of events. These errors, Mr. Martinez submits, were so serious, and so prejudicial to his defense, that they satisfy the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). The state court's contrary conclusion, Mr. Martinez claims, warrants federal habeas relief under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). For the reasons discussed below, I deny the petition and decline to issue a certificate of appealability.

## I.

The following facts are drawn primarily from the decisions of the Illinois Appellate court[3]

---

[3] There are four Illinois Appellate Court decisions in this case: *People v. Martinez*, No. 1-04-0126 (lll. App. Ct. July 5, 2006) ("*Direct Appeal*") (affirming Mr. Martinez's conviction and sentence on direct appeal); *People v. Martinez*, 2014 IL App (1st) 112794-U (reversing dismissal of postconviction petition at second stage motion to dismiss and remanding for third stage evidentiary hearing) ("*First Postconviction Appeal*"); *People v. Martinez*, 2019 IL App (1st) 171533-U

and are presumed correct under 28 U.S.C. § 2254(e)(1).[4] Where relevant, I include additional details gleaned from my own review of the state court proceedings.

At approximately 6:00 p.m. on December 28, 2000, police officers discovered Bobby's body in the Sundown Meadows Forest Preserve in southwest suburban Cook County. *First Postconviction Appeal*, 2014 IL App (1st) 112794-U, Dkt. 1-1 at 20; Dkt. 1-5 at 349. Bobby's autopsy showed that he suffered gunshot wounds to his left face and forehead. Dkt. 1-5 at 410-13; Dkt. 1-7 at 5-6. He had two additional gunshot wounds to the back left of his head. Dkt. 1-7 at 5-6. Two spent shell casings recovered from the crime scene, and two bullets recovered from Bobby's head and neck during the autopsy, were determined to be Winchester .380 automatic caliber ammunition. Dkt. 1-5 at 414-18. A cash register receipt from Taqueria Aguascalientes, a Mexican restaurant in Cicero, Illinois, was found on Bobby's person. *First Postconviction Appeal*, Dkt. 1-1 at 21; Dkt. 1-5 at 386-90; Dkt. 1-8 at 329; Dkt. 1-9 at 243, 245.

Mario Abarca was the state's first witness. At the time of Bobby's death, Mario was married to Bobby's mother, Hilda Sanchez, and he lived with Hilda, Bobby, and others at the Abarca/Sanchez family home in Cicero. Mario testified that Bobby and Mr. Martinez were friends, and that Mr. Martinez had also been living at the Abarca/Sanchez home, where he shared a room with Bobby, until November of 2000. *First Postconviction Appeal*, Dkt. 1-1 at 19; Dkt. 1-5 at 41-

---

(vacating denial of postconviction petition and remanding for additional evidentiary hearing proceedings after finding evidentiary errors in original postconviction evidentiary hearing) ("*Second Postconviction Appeal*"); *People v. Martinez*, 2021 IL App (1st) 171533-UB (affirming denial of postconviction petition after second evidentiary hearing) ("*Third Postconviction Appeal*").

[4] Although Mr. Martinez offers arguments impugning the credibility of certain witnesses, he does not challenge any specific factual finding by the Illinois Appellate Court, which, as discussed, below, including specific determinations about these witnesses' credibility.

42. Mario testified that although Mr. Martinez no longer lived at the Abarca/Sanchez home in December of 2000, he remained a frequent visitor, and he was there on the evening of December 27. Bobby and Mr. Martinez left the home together around 7:00 or 8:00 p.m. that evening. Mario never saw Bobby again.

Benjamin Abarca, Mario's brother, lived in the basement of the Abarca/Sanchez home and was involved in drug transactions with Bobby. Benjamin, too, testified that he last saw Bobby on December 27, 2000, when he left the house between 6:30 and 7:30 p.m. Benjamin testified that he called and paged Bobby repeatedly that evening, but Bobby did not answer or return his calls. Benjamin found this "very unusual," because Bobby "always" called him back "right away." Dkt. 1-5 at 60, 73. When Benjamin called Bobby's number between 9:30 and 10:00 that night, Mr. Martinez answered the phone. *First Postconviction Appeal*, Dkt. 1-1 at 20. Mr. Martinez told him that Bobby was "with a girl" and let Mr. Martinez borrow his phone. *Id*. at 69, 73. Benjamin testified that Mr. Martinez sounded nervous and hesitated when speaking with him on Bobby's phone. *Id*. at 74, 77. Benjamin's cell phone records were admitted at trial. Dkt. 1-5 at 437-38; Dkt. 1-6 at 277-86. The records confirmed that Benjamin called Bobby's phone fourteen times and his pager six times on December 27, 2000, between 8:21 p.m. and 10:06 p.m. *Id*.

Bobby's girlfriend, Iliana Herrera, testified that she called Bobby's cell phone at around 7:30 p.m. and his pager at 11:15 p.m. on December 27, 2000, but Bobby did not respond. When she called Bobby's phone again around midnight, Mr. Martinez answered and told her that he had dropped Bobby off at the home of Oscar Solis, and that Bobby had left his phone in Mr. Martinez's car. Herrera found that odd; in the two years she had been dating Bobby, she had never seen him give his phone to anyone, and he never let anyone borrow it. Dkt. 1-5 at 265-66. Solis, for his part,

4

testified that he did not see Bobby on the night of December 27. According to Solis, he and Bobby had made plans earlier that day for Bobby to come to his house to hang out, but Bobby never showed up. *Id*. at 341, 344.

Adam Reyes, a member of the Satan Disciples and a convicted felon, testified that Mr. Martinez was a leader of the Satan Disciples. *First Postconviction Appeal*, Dkt. 1-1 at 18. Reyes and Bobby both sold drugs for Mr. Martinez. *Id*. In November of 2000, Mr. Martinez began to suspect that Bobby was a "trick," i.e., an informant who was cooperating with law enforcement, and he told Reyes that Bobby "had to be dealt with." *Id*.; Dkt. 1-5 at 111. Reyes thought this was "just talk," but the following month, Mr. Martinez again told Reyes that Bobby had to be dealt with. Reyes told him "it wasn't a good idea," and that he had "nothing against Bobby like that[.]" Dkt. 1-5 at 113. Mr. Martinez responded that he would "do it" himself. *Id*. at 114. A few days later, however, Mr. Martinez told Reyes and Rachel Narbaiz—who later married Mr. Martinez's brother—to shoot Bobby. They both refused, and Mr. Martinez became angry. *Id*. at 115. Despite disobeying Mr. Martinez's order to kill Bobby, Reyes was not punished by the gang. *First Postconviction Appeal*, Dkt. 1-1 at 18.

Reyes testified that around 7:30 p.m. on December 27, 2000, Mr. Martinez called him and asked to borrow a .380 caliber automatic gun that Reyes had gotten from Mark Alonzo, or "Shortie." Dkt. 1-5 at 115-17. Shortly thereafter, Mr. Martinez went to Reyes's home in Cicero. *Id*. Mr. Martinez told Reyes that he planned to lure Bobby into the woods by explaining that he had to dispose of the gun. *First Postconviction Appeal*, Dkt. 1-1 at 18-19. Reyes looked outside and saw a person who looked like Bobby in the passenger seat of Mr. Martinez's car. Dkt. 1-5 at 122. Mr. Martinez took the gun from Reyes and drove off. Dkt. 1-1 at 18. Reyes testified that at

about 9:40 p.m., Mr. Martinez called him and reported that everything was "mashed potatoes and gravy," which Reyes took to mean that he had killed Bobby. *Id*. at 19. Phone records showed that a call was made from Bobby's cell phone to Reyes's cell phone at 9:42 p.m. *Id*. at 22.

At around 1:30 a.m. on December 28, 2000, Reyes met up with Mr. Martinez and others at the home of their friend Samantha Mercado. Reyes noticed that Mr. Martinez no longer had on the winter jacket he had been wearing earlier that evening, which Mr. Martinez said had gotten "all f**cked up." Dkt. 1-5 at 127, 129. Mr. Martinez and Reyes went for a drive, during which Mr. Martinez told Reyes that he "smoked Bobby, shot him in the head, and that he cried like bitch." *First Postconviction Appeal*, Dkt. 1-1 at 19; Dkt. 1-5 at 128-29. Mr. Martinez told Reyes that he threw away the gun after killing Bobby. On New Year's Day, Mr. Martinez called Reyes and told him to keep his mouth shut about the murder. *Id*. at 131.

On cross-examination, Reyes testified that he had an agreement with the state under which he would not be charged for Bobby's murder if he told the state everything he knew about the shooting. On redirect examination, however, Reyes stated that he had no written agreement with the state, nor had he and the prosecutor discussed charges against him "one way or another." Dkt. 1-5 at 166-67. Reyes explained that he agreed to tell the truth and "hoped" that he would not be prosecuted. *Id*. at 167.

Samantha Mercado testified that at the time of Bobby's death, she and Reyes were friends, and she had known Mr. Martinez for about two years. Mr. Martinez, Reyes, and Bobby would come to her house in Cicero to "party." *First Postconviction Appeal*, Dkt. 1-1 at 19. Mercado testified that she was at Reyes's house on the evening of December 27, 2000, and that Mr. Martinez

came to the house and spoke to Reyes, then left. On cross-examination, Mercado testified that she did not see Reyes hand Mr. Martinez a gun, or anything else, during his visit. *Id*.

Elba Luna testified that her sister June was dating Mr. Martinez in December of 2000. On December 24, Luna helped her mother and sister move to a home on the south side of Chicago. On the afternoon of December 28, Mr. Martinez drove Luna to the Abarca/Sanchez family home, where at Mr. Martinez's request, she gave Bobby's cell phone to Bobby's sister. *First Postconviction Appeal,* Dkt. 1-1 at 20.

Elwin Trammell, a Cook County Forest Preserve police sergeant, testified that he interviewed Mr. Martinez on January 4, 2001, in the presence of FBI special agent Todd Mayberry. *Id*. at 21. During the interview, Mr. Martinez admitted to being a member of the Satan Disciples and a drug dealer, and he told Sergeant Trammell that both Bobby and Adam Reyes sold drugs for him. Mr. Martinez told Trammell that he had lived at Bobby's home for about three months but began living at his grandmother's house in Chicago in December of 2000.

Mr. Martinez told Sergeant Trammell that he last saw Bobby on December 26, 2000, at his (Mr. Martinez's) mother's home in Cicero, and that Bobby had been in his car earlier that day. Dkt. 1-5 at 546. After finding Bobby's cell phone in the back seat of his car the next day (December 27), he tried to return it to Bobby's house, but no one was home. According to Trammell, Mr. Martinez said that he spent the evening of December 27th helping June, June's mother, her sister Elba, and her brother move to a home on the south side. Mr. Martinez reported going to the White Castle restaurant near June's mother's new home at around 7:30 p.m. that evening, after which he spent the night at June's mother's home and left at around 7:30 the following morning (December

28). *Id.* Mr. Martinez recounted that on December 28th, he ran errands with Elba, which included driving to the Abarca/Sanchez family home, where he gave Bobby's phone to Bobby's sister. *Id.*

During subsequent questioning, however, Mr. Martinez told Sergeant Trammell that he last saw Bobby at the Abarca/Sanchez residence between 8:00 and 9:00 p.m. on December 27th (rather than at Mr. Martinez's mother's house on December 26th). When Sergeant Trammell pointed out the discrepancies in his statements, Mr. Martinez told him that he had confused the dates.

After the state rested, the parties agreed to a number of stipulations. Among them was that the evidence recovered from the scene included two receipts. Defense counsel sought the admission of the receipts into evidence. The court admitted the receipts but held that the information they contained was hearsay that could not be considered. Defense counsel stated, "that's fine." *Id.* at 490.

The court then summarized the evidence, "assessing the credibility of the witnesses and resolving the conflicts in the testimony." It began by canvassing the evidence that it found "suspicious but there may be a reasonable explanation also." This included, *inter alia*, the fact that Mr. Martinez had Bobby's cell phone and used it to receive calls. *Id.* at 540. With respect to Reyes, the court stated:

> The defense has attacked Adam Reyes. I have had an opportunity to review his testimony, his actions on the stand, the way he testified. He did not testify in a loud manner, but nevertheless I observed other things about him and I have questioned why he was not charged. He's the one that says he knew that Bobby Sanchez was going to be killed and he provided the gun and he was not charged. However…during the entire testimony it was established that no deal or any agreement had been made between him and the State.

*Id.* at 542. The court then made the following factual findings: (1) Mr. Martinez was with Bobby shortly before his disappearance and death; (2) Reyes was a credible witness; (3) Mr. Martinez

8

twice solicited Reyes—including once along with Rachel Narbaiz—to kill Bobby; (4) Mr. Martinez obtained from Reyes the .380 caliber gun that was used to kill Bobby; and (5) Mr. Martinez told Reyes what he intended to do with the gun and called Reyes afterwards to tell him it was done—a fact the court noted "was corroborated by the phone records." *Id*. The court went on to observe the inconsistencies in Mr. Martinez's statements to Sergeant Trammell concerning his whereabouts at relevant times. At the end of this summary, the court concluded that the evidence, while circumstantial, proved beyond a reasonable doubt that Mr. Martinez was guilty of Bobby's murder.

### A. Direct Appeal

Mr. Martinez appealed the verdict to the Illinois Appellate Court, arguing that: (1) the trial court erred in admitting Sergeant Trammell's testimony recounting Mr. Martinez's oral statement; (2) there was insufficient evidence to support the conviction, as Reyes's testimony was not credible; and (3) the trial court violated Mr. Martinez's confrontation rights through the admission of various stipulations. Dkt. 1-1 at 3, Dkt. 14-1. The appellate court rejected these arguments and affirmed Mr. Martinez's conviction and sentence. Dkt. 1-1 at 3-15. In a *pro se* petition for leave to appeal to the Illinois Supreme Court, Mr. Martinez renewed his challenge to the introduction of his oral statement and his confrontation claim. Dkt. 14-3, at 5. The Illinois Supreme Court denied his PLA, completing his direct appeal. *Illinois v. Martinez*, No. 103199, 222 Ill.2d 590, 861 N.E.2d 660 (Ill. Nov. 29, 2006) (Table).

### B. Post Conviction Proceedings

After his direct appeal became final, Mr. Martinez filed a *pro se* postconviction petition before the state trial court. Dkt. 1-7 at 92. The petition claimed that his trial counsel was

9

constitutionally ineffective for: (1) failing to call Rachel Narbaiz and Mark Alonzo (a/k/a "Shortie") as witnesses to impeach Adam Reyes's credibility, *id*. at 94-103; (2) failing to develop evidence or argue at trial that Benjamin Abarca was a possible alternative suspect, *id*. at 103-05; and (3) allowing the use of Adam Reyes's allegedly perjured testimony. *Id*. The petition further alleged prosecutorial misconduct based on the knowing use of Reyes's perjured testimony. *Id*. at 103-05.

Through an appointed public defender, Mr. Martinez raised additional postconviction claims of ineffective assistance of trial counsel. He claimed that his attorney failed to: (1) call Samantha Mercado's mother, Diana Mercado, to rebut a portion of Adam Reyes's testimony, *id*. at 168-71; (2) properly introduce the Taqueria Aguascalientes restaurant receipt into evidence, *id*. at 173-76; (3) call Maritza Amaya as an alibi witness, *id*. at 176-77; and (4) argue that the telephone calls from Bobby's cellphone were inconsistent with the state's theory of the case. *Id*. at 177-79. The court denied the postconviction petition without conducting an evidentiary hearing. Dkt. 1-7 at 371-80.

Mr. Martinez appealed, reasserting his claims that his trial counsel was ineffective for failing to: (1) call Rachel Narbaiz and Diana Mercado as witnesses to rebut Adam Reyes's testimony; and (2) pursue an alibi defense based on the testimony of Mr. Martinez's mother, who would have testified that Martinez was at her home on December 27, 2000. Dkt. 14-4. The appellate court held that the trial court erred in dismissing the petition on the pleadings and remanded for an evidentiary hearing. *First Postconviction Appeal*, Dkt. 1-1 at 34.

On remand, Mr. Martinez's present counsel appeared on his behalf and filed a second supplemental postconviction petition, which sought to present three additional witnesses—Mr.

Martinez's stepfather, Pablo Amaya; an employee of Taqueria Aguascalientes, Martha Macias; and a private investigator, Eladio Valdez, to support his claims. Dkt. 1-8 at 19-68. He argued that Pablo Amaya would testify consistently with Mr. Martinez's mother that Mr. Martinez was at their home on the evening of December 27, 2000. *Id*. at 23-24. Macias would lay the foundation required to introduce the Taqueria Aguascalientes receipt as a business records. *Id*. at 25. And Valdez would testify as to the feasibility of the timeline of events the state described, given the travel times between various relevant locations. *Id*. at 25-26. The state objected to these new witnesses as beyond the scope of the remand. *Second Postconviction Appeal*, 2019 IL App (1st) 171533-U, Dkt. 1-1 at 46. The court excluded the testimony of Pablo Amaya and Valdez, but it allowed Macias to testify regarding the restaurant receipt. *Id*.

At the hearing, Macias testified that she was familiar with the Taqueria Aguascalientes cash register during the relevant period; that the cash register was in working order when the receipt at issue—which reflected a purchase of seven tacos and two drinks—was printed. Macias further testified that the date and time printed on the receipt—20:24 (i.e., 8:24 p.m.) on December 27, 2000—reflected the time the customer was rung up, which was ordinarily at the end of the meal. Dkt. 1-9 at 244, 249, 251, 261, 263.

Maritza Amaya testified that on the evening of December 27, 2000, she was at her home with her children and other family members, including two who were visiting from Puerto Rico. Dkt. 1-9 at 277-79. Maritza stated that Mr. Martinez arrived around 5:00 p.m. while she was cooking, and that Bobby arrived at around 7:30 p.m. and asked Mr. Martinez for a ride to Taqueria Aguascalientes. *Id*. at 279-81. Mr. Martinez returned home around 9:00 p.m. that evening, then left again at around 10:00 p.m. to help his girlfriend's mother move. *Id*. at 282-83. Maritza stated

that she remembered the time her son came home after leaving with Bobby because her husband's practice was to brush his teeth and get ready for bed around 9:00 p.m. due to his work schedule, and that is what he was doing when Mr. Martinez returned. *Id*. at 289. (Pablo's affidavit, however, stated that his work schedule had recently changed in December of 2000, and that the factory where he worked was closed between Christmas and New Year's, so he was not working on December 27, 2000. *See* Dkt. 1-1 at 332, ¶ 11. Pablo's affidavit further stated that he recalls the evening in question because the girlfriend of Maritza's son Jovani and the couple's young daughter were visiting for the first time since moving to Puerto Rico. *Id*. at ¶ 13.) Maritza also testified that she attended Mr. Martinez's trial and tried to tell Lopez that her son was at her home on the evening Bobby disappeared, but Lopez simply told her not to worry and that everything would be fine. *Id*. at 287.

Rachel Narbaiz testified that she was the girlfriend of Mr. Martinez's brother at the time of Bobby's death, and his fiancé at the time of the postconviction hearing. *Id*. at 341, 343. Narbaiz knew Adam Reyes as her best friend's brother and knew Bobby through Mr. Martinez's brother. *Id*. at 341. Narbaiz had not spoken to Mr. Martinez or to Reyes since 2000. *Id*. at 343. Narbaiz denied that Mr. Martinez ever asked either her or Reyes to kill Bobby. *Id*. at 345. She did not attend Mr. Martinez's trial and stated that she was not contacted by Lopez or anyone working for him regarding her potential testimony. *Id*. at 346.

Mr. Martinez testified that prior to his trial, Lopez did not discuss the case with him and only spoke to him briefly about getting paid. Dkt. 1-9 at 364-66. When Mr. Martinez attempted to raise the merits of his case, Lopez just told him not to worry. *Id*. Mr. Martinez told Lopez that Reyes's testimony was not true, and that Rachel Narbaiz could rebut it. *Id*. at 368. He stated that

he gave Narbaiz's phone number to Lopez during the trial. *Id*. Mr. Martinez testified that he also told Lopez that Sergeant Trammell, too, "was lying," and that he (Mr. Martinez) was at his mother's house on December 27th, 2000. *Id*. at 369. On cross-examination, Mr. Martinez conceded that he never sought to fire Lopez. He stated that Lopez had been hired by his friend Robert Vega, and that he (Mr. Martinez) did not have the means to hire another lawyer. *Id*. at 385-87.

The court then heard testimony from Lopez. *Second Postconviction Appeal*, Dkt. 1-1 at 47.[5] Lopez testified that he had been an attorney for 32 years, during which time he had handled upwards of fifty murder cases. Dkt. 1-9 at 405. His practice was to discuss the possible trial strategies with each of his clients, and he spoke to Mr. Martinez about trial strategy on multiple occasions prior to his trial. *Id*. at 405-06, 412. He denied demanding money from Mr. Martinez. *Id*. at 413. Lopez explained that his trial strategy was to argue that Reyes was not a reliable witness, *id*. at 456-57, and that the prosecution had not proved its case beyond a reasonable doubt. *Id*. at 461.

According to Lopez, Mr. Martinez confessed to him that he shot Bobby, took his cell phone, and made up a false alibi story. *Id*. at 415-17, 480. Lopez recounted that prior to Bobby's murder, in late October or November of 2000, Mr. Martinez and Robert Vega—neither of whom was a client at the time—went to Lopez's office and asked him to find out if Bobby, whom they

---

[5] The court held that petitioner's ineffective assistance of counsel allegations waived his attorney-client privilege with Lopez. *Second Postconviction Appeal*, 2019 IL App (1st) 171533-U. at ¶ 34. In response, Mr. Martinez sought to compel discovery concerning Lopez's alleged involvement in a murder-for-hire scheme charged in *Illinois v. Panozzo*, No. 14 CR 14577 (Circuit Court of Cook County), arguing that these materials were potentially relevant to Lopez's bias. The trial court denied this request, and the Illinois Appellate Court found no abuse of discretion, concluding, "it is not even clear that [Lopez] was under criminal investigation, let alone facing pending criminal charges." 2019 IL App (1st) 171533-U, ¶ 81.

suspected of being a "snitch," had a pending federal criminal case. *Id*. at 480-83. They wanted to know if Bobby had been caught by the "feds" and become a cooperating witness. *Id*. (Lopez was not asked, and the record does not disclose, how Lopez responded.)

Lopez testified that he decided not to call Rachel Narbaiz as a witness due to concerns about her credibility. Lopez explained that he reviewed a police investigation report of a pretrial interview of Narbaiz, which reflected that her boyfriend—Mr. Martinez's brother—was present for the interview, and that her statement "kind of looked staged." Dkt. 1-9 at 422.

The postconviction court concluded that the evidence did not establish a violation of *Strickland v. Washington*, 466 U.S. 668 (1984). The court noted that the trial judge found Reyes to be a credible witness, despite defense counsel's spirited attack on Reyes's credibility at trial. Dkt. 1-1 at 255. With respect to Lopez's failure to call Rachel Narbaiz as a witness, the postconviction court credited Lopez's testimony that he decided not to call her due to concerns about her credibility. Indeed, the court noted that it had an opportunity to "observe and evaluate the credibility of Ms. Narbaiz as a witness," and found that Lopez's concerns "appear valid." *Id*. at 256. The court acknowledged that Lopez mentioned Narbaiz in his opening statement, but it found this fact consistent with Lopez's explanation that he made a strategic choice not to call her, as it showed that he "did know of her existence." *Id*. As for the restaurant receipt, the court found that its 8:24 p.m. time stamp "could actually support the State's case," since it was "plausible" that Mr. Martinez and Bobby went to pick up food then went on to the forest preserve, where Mr. Martinez shot Bobby. *Id*. at 257-58. Accordingly, the court concluded that Mr. Martinez had not demonstrated a reasonable probability that the outcome of the case would have been different had Lopez successfully overcome the prosecution's hearsay objection. *Id*.

14

Finally, the court rejected Mr. Martinez's argument regarding Lopez's failure to call Maritza and Pablo Amaya as alibi witnesses to testify that Mr. Martinez was at their home around 9:00 p.m. on December 27, 2000. *Id*. at 258. The court noted several weaknesses in Maritza's testimony that called her credibility into question. More fundamentally, having credited Lopez's testimony that Mr. Martinez confessed to him that he murdered Bobby, the court concluded that Lopez's ethical obligations as an attorney prevented him from presenting witnesses whose testimony he knew was false based on his client's confession. *Id*. at 259.

Mr. Martinez again appealed the denial of his postconviction petition. He argued that: (1) his counsel's failure to lay the foundation for admission of the Taqueria Aguascalientes receipt alone amounted to constitutionally ineffective assistance; (2) counsel's failure to present evidence promised in opening statements and "other exculpatory evidence"—the testimony of Maritza Amaya, whom Mr. Martinez faulted his lawyer for failing to interview—was deficient performance; and (3) these errors cumulatively prejudiced the outcome.[6] *See generally*, Pet. Br., Dkt. 14-7. The Illinois Appellate Court rejected these arguments and affirmed. *Third Post Conviction Appeal*, 2021 IL App (1st) 171533-UB, Dkt. 1-1 at 71-101.

In his PLA to the Illinois Supreme Court, Mr. Martinez framed the issue in terms of a "conflict in the law regarding ineffective assistance," and urged the court to resolve, as an "issue of first impression," whether "ineffective assistance claims based on counsel's failure to deliver important evidence promised in opening statement should be adjudicated when the lapse occurs during a bench trial instead of before a jury." PLA, Dkt. 14-13 at 5, 8. Mr. Martinez asked the

---

[6] Mr. Martinez also challenged several of the postconviction court's evidentiary rulings, but he does not assert these errors as grounds for habeas relief.

court to determine "what is required for an accused to show that he was deprived of his right to effective assistance of counsel when his attorney promises to present crucial defenses in opening statement, but then fails to deliver, and the lapse occurs during a bench trial." *Id*. at 17, 19. The issue thus framed, Mr. Martinez argued that he was prejudiced by his trial counsel's failure to call Narbaiz as a witness and to gain admission of the restaurant receipt. The Illinois Supreme Court summarily denied Mr. Martinez's PLA, concluding his state postconviction proceedings. *Illinois v. Martinez*, No. 127368, 175 N.E.3d 97 (Ill. Sept. 29, 2021) (Table). His habeas petition followed.

**II**.

Mr. Martinez's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 28 U.S.C. § 2242 et seq. ("AEDPA"), which authorizes federal courts to grant habeas relief only when a state court's decision was (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)(2). By design, this standard is "difficult to meet" and "highly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

"A decision is 'contrary to' clearly established federal law if the rule the decision applies differs from governing law set forth in Supreme Court cases." *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). This requires more than a "semantic difference" between the state court's formulation of the governing standard and the actual Supreme Court test. *Allen v. Chandler*, 555 F.3d 596, 601 (7th Cir. 2009). The state court decision must be "'substantially different' from or 'opposite to' relevant Supreme Court precedent." *Id*. (quoting

16

*Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court unreasonably applies Supreme Court precedent where it "identifies the correct governing legal principle" from the Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 602. An unreasonable application "is one with which no fairminded jurist would agree." *Andrew v. White*, 604 U.S. ---, 145 S. Ct. 75, 80 (2025) (citing *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). In cases involving the Sixth Amendment right to counsel, federal courts' review under the AEDPA is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

In addition to satisfying these substantive requirements, a state prisoner seeking federal habeas relief must first exhaust his available state court remedies. 28 U.S.C. § 2254(b)(1)(A). This means that the petitioner must fully and fairly present his federal claims through one complete round of state appellate review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, the petitioner must have "placed both the operative facts and the controlling legal principles before the state courts." *Sturgeon v. Chandler*, 552 F.3d 604, 610 (7th Cir. 2009) (citations omitted). Any claim not properly presented at each level of state review is procedurally defaulted, precluding federal habeas relief unless the petitioner can establish either: (1) cause for the default and prejudice; or (2) that the failure to consider the claims will result in a fundamental miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 724 (1991).

Mr. Martinez's habeas petition articulates two broad grounds for relief. The first is that the state court unreasonably applied *Strickland* when it failed to find Lopez deficient for: (1) failing to provide a foundation for admission of the Taqueria Aguascalientes receipt; and (2) failing to

call Rachel Narbaiz to testify after suggesting in his opening statement that she was a key witness. Mr. Martinez also claims that a reasonable application of *Strickland* would have required the state court to find Lopez constitutionally deficient for failing to present Maritza and Pablo Amaya as alibi witnesses. Mr. Martinez goes on to identify two further grounds for relief, both of which he calls "Ground 2": first, that the appellate court's "piecemeal and erroneous adjudication of prejudice was an unreasonable application of *Strickland*, Dkt. 1 at 14, 33; and second, that the appellate court's "definition of deficient performance was, in and of itself, contrary to or an unreasonable application of *Strickland*." *Id*. at 39.

The government argues that the only claim Mr. Martinez properly preserved for substantive review is the claim that Lopez performed deficiently by promising in his opening statement to present evidence that he ultimately failed to present. Regardless of whether this claim is framed in terms of counsel's failure to deliver on his "promise," or his failure to present substantive evidence—Narbaiz's testimony and the time stamp of the restaurant receipt—that might reasonably have affected the outcome (regardless of whether it was "promised"), all agree that Mr. Martinez presented the legal and factual basis for this claim throughout his state proceedings, thus preserving it for federal habeas review. His remaining claims, however, are procedurally defaulted.

Mr. Martinez's argument that Lopez performed deficiently by failing to present the testimony of Maritza Amaya appears nowhere in his PLA to the Illinois Supreme Court. To preserve a *Strickland* claim for federal habeas review, "[t]he specific ground for ineffectiveness raised in the federal petition must have been raised in the state case." *Everett v. Barnett*, 162 F.3d 498, 502 (7th Cir. 1998) (citing *Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (claim that counsel was ineffective for failing to call a particular witness was defaulted even though the

petitioner had argued that counsel was ineffective for failing to call other witnesses)). Mr. Martinez's insistence that his claim based on Lopez's failure to call Maritza is preserved because it is "intertwined" with his non-defaulted claims does not survive scrutiny. *See Sturgeon* 552 F.3d at 610 (7th Cir. 2009) (claim must be "placed in the petitioner's brief to the [state] court," and this "requirement is not met if a judge must go outside the four corners of the document in order to understand the contention's nature and basis.") (citations omitted). As for Mr. Martinez's alternative "Ground 2" arguments—that the appellate court applied either a prejudice standard or a performance standard that was contrary to *Strickland*—he does not dispute that neither argument appears in his PLA to the Illinois Supreme Court.

Mr. Martinez's superficial effort to overcome his procedural default based on the "fundamental miscarriage of justice" exception falls short. This exception applies when a petitioner can establish his "actual innocence" through "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *House v. Bell*, 547 U.S. 518, 537 (2006). Successful invocation of this "gateway claim" is "rare: a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (internal quotation marks, citations, and alterations omitted).

Mr. Martinez identifies no "new" evidence of his actual innocence but merely revisits the theme he has pressed throughout his appeals—that "the State's case rose and fell on Adam Reyes"—and asserts baldly that the "omitted evidence," i.e., Maritza Amaya's alibi testimony, "demonstrates [his] innocence." Reply, Dkt. 17 at 5. But as the postconviction court observed,

19

Maritza admitted that she approximated the time Mr. Martinez arrived at her house based on her husband's typical routine—although Pablo's own affidavit describes atypical events happening at the family home on the evening in question. *See* Dkt. 1-1 at 332. The court further noted that Maritza had "difficulty remembering the details" of how her affidavit was prepared. *Id*. at 258-59. This is not the kind of iron-clad evidence the law requires to establish actual innocence. *See McDowell v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) ("adequate evidence is documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim…. Only such 'powerful' evidence can establish that it is more likely than not that no jury would have convicted a habeas petitioner.") (alteration, internal quotation marks, and citation omitted).

Turning to the merits of Mr. Martinez's preserved claim, I conclude that he has not met the standard that applies to *Strickland* cases analyzed under § 2254(d) of the AEDPA. Recall that in his PLA to the Illinois Supreme Court, Mr. Martinez argued that his *Strickland* claim presented "an issue of first impression" on which there was a "conflict in the law." Dkt. At 3, 8, 17. Stated differently, Mr. Martinez urged the Illinois Supreme Court to answer an unresolved constitutional question on which lower courts have disagreed. The AEDPA does not authorize federal courts to grant habeas relief on the basis of such claims. To the contrary, claims governed, as Mr. Martinez's is, by § 2254(d) may be granted only when no fairminded jurist could disagree that the state court's decision is irreconcilable with clearly established Supreme Court precedent. *See Harrington*, 562 U.S. at 102. In other words, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles* 556 U.S. at 122 (internal quotation marks and citations omitted). As Mr.

20

Martinez's submission to the Illinois Supreme Court makes clear, the Supreme Court of the United States has not addressed the "specific legal rule" on which his *Strickland* claim is based. So the state court's decision cannot have been contrary to, or have unreasonably applied, any such rule.

Nor has Mr. Martinez shown that no fairminded jurist could reasonably conclude, as the state court did here, that his *Strickland* claims lacked merit. With respect to his counsel's failure to call Rachel Narbaiz as a witness, the Illinois Appellate Court appropriately deferred to the postconviction court's post-hearing factual findings—specifically, that Lopez testified credibly that he declined to call Narbaiz out of concern that her testimony appeared "staged," and that Lopez's reluctance appeared "valid" based on Narbaiz's "very selective memory" and "serious credibility concerns." Dkt. 1-1 at 96. The court also considered Lopez's mention of Narbaiz during his opening statement and determined that it did not amount to a "promise" that she would testify. Nothing in Mr. Martinez's habeas submissions persuades me that no fairminded jurist could find these conclusions reasonable.

With respect to counsel's failure to lay the foundation to admit the contents of the Taqueria Aguascalientes receipt, Mr. Martinez has not shown that no reasonable juror could agree with the Illinois Appellate Court's conclusion that this lapse did not prejudice the outcome of the case. The appellate court found no error in the postconviction court's observation that the receipt's 8:24 time stamp was arguably consistent with the state's timeline. The appellate court further noted that other evidence in the case that pointed to Mr. Martinez as Bobby's killer, including the fact that Mr. Martinez was in possession of Bobby's cell phone and gave inconsistent accounts of his whereabouts on the evening of Bobby's murder, supported the lower court's conclusion that Mr. Martinez had not shown a reasonable probability that the outcome of the case would have been

21

different had the receipt's substance been admitted. *Id*. at 100-01. In short, Mr. Martinez has not shown that the Illinois Appellate Court's analysis or conclusion conflicts with, or unreasonably applies, *Strickland* or any other governing Supreme Court precedent.

### III.

For the foregoing reasons, Mr. Martinez's habeas corpus petition is denied. Because I conclude that Mr. Martinez has not made a substantial showing of the denial of a constitutional right, and that reasonable jurists would not debate or disagree with my resolution of his claims, I decline to issue a certificate of appealability. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). The Clerk is instructed to enter a Rule 58 judgment in favor of Respondent and against Mr. Martinez. Civil Case Terminated.


ENTERED:


ELAINE E. BUCKLO
United States District Judge


Dated: March 28, 2025